[No. 28498.   Department One.   April 23, 1942.]

THE STATE OF WASHINGTON, *on the Relation of B. Gray Warner, as Prosecuting Attorney for King County, Appellant,* v. HAYES INVESTMENT CORPORATION *et al., Respondents.*[1]

[1]Reported in 125 P. (2d) 262.

B. *Gray Warner* and *Wm. R. Bell,* for appellant.

C. *P. Borberg,* for respondent Hayes Investment Corporation.

*Weter, Roberts & Shefelman,* for respondents Heath.

MILLARD, J.—Kenneth and Elihu Heath operated a public bathing beach and trailer camp, as tenants of the Roland Denny estate, on the west shore of Lake Washington at the southeast corner of the Sand Point naval air station in Seattle. The Heaths vacated that property when it was acquired in August, 1938, for naval air station purposes by the United States government. A site in rural King county, five hundred

feet north of the naval air station and lying between Lake Washington and the Sand Point highway, was leased by Hayes Investment Corporation to the Heaths, who removed the trees and underbrush from the property and invested about five thousand dollars in improvement of the property for use as a public bathing beach and trailer camp.

Since August 25, 1938, the Heaths have continuously operated their camp for bathing and picnicking. Space is rented for trailers and three cabins are rented to more or less permanent tenants. None of the neighbors of the Heaths has ever complained to the Heaths concerning the manner in which the camp is operated. A bath house with showers is maintained for bathers of both sexes and for those who live in trailers. Clean and adequate toilet facilities are maintained to serve the needs of all patrons of the camp. Two boats have been kept at the beach for life saving purposes and for rental, but, at the time of the trial of this action, only one boat was seaworthy and its use was restricted solely for life saving. A small refreshment stand is operated at the beach and only soft drinks are sold. Elihu Heath lives at the beach, of which he is in charge twenty-four hours a day. Kenneth Heath lives a short distance from the beach and in the summer time is at the camp daily.

The main business in summer is bathing and picnicking. The attendance on an average warm summer week day has not exceeded one hundred persons, which average on a warm Saturday or Sunday is increased to one hundred and fifty persons. The Heath beach is the only public beach on Lake Washington from Madison park in the city of Seattle to Kenmore, a distance of approximately sixteen miles, and affords the only feasible opportunity for outdoor bathing and swimming for most of the residents of the northeast

districts of the city of Seattle, and that portion of King county adjoining those districts and extending several miles north.

On February 27, 1939, pursuant to the planning commission statute (Rem. Rev. Stat., (Sup.) § 9322-1 [P. C. § 4471-61] *et seq.*), the King county board of county commissioners passed a resolution zoning certain land which prior thereto had not been zoned in rural King county, in which zone area the property operated by the Heaths for a public bathing beach and trailer camp was included. The area embraced in this resolution and designated as first-class residence property only, with but one or two minor exceptions, comprises the entire west shore of Lake Washington from the northerly limits of the city of Seattle to Kenmore and extends west from the lake shore not less than one-half mile. There are many small farms and a great deal of wild land within this area.

In the immediate vicinity of the Heath beach, there are several residences on the lake shore. The owners of those residences object to the presence of the beach and trailer camp. On the basis of their complaints of noise, vulgar and profane language, drinking of intoxicants, and trespassing by patrons of the Heath beach, an action was instituted by the prosecuting attorney of King county against Hayes Investment Corporation and the Heaths, challenging the operation of the bathing beach and trailer camp upon grounds that it constituted a public nuisance and that such operation was violative of the county zoning regulation. The cause was tried to the court, which expressed the view that the zoning resolution of the board of county commissioners was an unreasonable, unnecessary, and arbitrary exercise of power; that there was no evidence to justify the zoning of defendants' prop-

erty as first-class residence property; and that the evidence did not sustain the complaint that the operation of the bathing beach constitutes a public nuisance. Judgment of dismissal was entered. The prosecuting attorney appealed.

A public nuisance is

". . . one which affects equally the rights of an entire community or neighborhood, although the extent of the damage may be unequal." Rem. Rev. Stat., § 9912 [P. C. § 9131-69].

None of the public nuisances enumerated in Rem. Rev. Stat., § 9913 [P. C. § 9131-78] embraces the operation of a business such as that of which the appellant complains. A nuisance is defined, as follows, by the statute:

"Nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others, offends decency, or unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake or navigable river, bay, stream, canal, or basin, or any public park, square, street or highway; or in any way renders other persons insecure in life, or in the use of property." Rem. Rev. Stat., § 9914 [P. C. § 9131-68].

The statute (Rem. Rev. Stat., § 2500 [P. C. § 9012]) which provides that a public nuisance is a crime is in substantially the same language as Rem. Rev. Stat., § 9914.

The trial court correctly held that the evidence does not establish that respondents' operation of the public bathing beach and trailer camp is a public nuisance. At most the evidence established that the owners of residences close to the respondents' property suffered some occasional minor annoyance. from the operation of the respondents' camp, and that those complainants are of the impression that the operation

of that camp has depreciated the value of their property. Those who protest against the operation of the respondents' business are not in agreement as to the cause for complaint. From the testimony of this group it is clear that the activities, to which the complainants object, do not affect "equally the rights of an entire community or neighborhood," which the statute (Rem. Rev. Stat., § 9912) specifies as a prerequisite of a public nuisance.

The fourteen witnesses called by appellant are in accord that they object to the existence of a public beach because of the "stigma" of having a public beach in that vicinity. One of these witnesses testified that the bathing beach was conducted in an orderly manner and he had no complaint to register on that ground. None of appellant's witnesses ever complained to respondents. Some of those witnesses had never visited the Heath beach although it was open to their inspection at all times. Of course, it is to be anticipated that from a group of one hundred and fifty or more people engaged in picnicking and swimming there would be some noise, but there was nothing extraordinary or unusual about it. Nor was that noise comparable to the noise in the average school yard during a recess period. Noise of the character in question may not be characterized as a nuisance. We held in *Turtle v. Fichett,* 156 Wash. 328, 287 Pac. 7, that the ordinary noise resulting from attendance of people at a picnic or recreation ground, conducting themselves in an orderly manner, during the day time and early evening, does not constitute a nuisance.

That the noise of the beach did not disturb the complainants the court was convinced, as we are. Those complainants live near the Sand Point naval air station where airplanes are frequently taking off and landing, and where a great defense construction pro-

gram has been under way for a few years. There is testimony that the noise from the planes is so great that it is impossible to use a telephone for a period as long as two hours at a time. It may be also observed that the Sand Point highway and railroad right of way pass directly behind complainants' property.

Complaints were made that some patrons of respondents' beach used profane language. Many witnesses who were patrons of the beach testified they never heard any profanity and it is unlikely that these witnesses who brought their children to the beach would have continued to patronize the camp if there had been a substantial amount of profanity. Kenneth Heath spent most of his time policing the beach to prevent the occurrence of the thing of which complaint is made, and anyone who would not heed the warning to refrain from bad language would be promptly evicted. The only evidence in support of the complaint respecting vulgar and profane language on respondents' property is that some boys were guilty of profanity and that they uttered some vulgar words.

One or two families complained that they saw a man and a woman riding in a boat and another woman being towed; that the parties were drinking whiskey from a bottle. It may be conceded that the two witnesses who testified to this incident observed the drinking from a bottle, but it is difficult to understand how, at a distance of two hundred and fifty feet from the participants in the drinking, the two witnesses could read a label on a bottle. This may have annoyed the two witnesses and have been an unpleasant experience for them, but, if it was a nuisance, it was, as the trial court stated, only a nuisance to one or two who saw it and was not a public nuisance.

Respondents were not responsible for that occurrence; they never sold intoxicants and never allowed the use of same on their premises.

The complaint that patrons of respondents' beach rented boats and rowed along the lake shore observing the yards and residences of neighbors is without merit. Such conduct was no more an invasion of privacy than for one to walk along the sidewalk in any city and observe the yards of the residences abutting on the sidewalk. Lake·Washington is a public highway. Rem. Rev. Stat., § 8407 [P. C. § 4560]. The rental of one or two boats at the beach and their incidental use do not constitute a public nuisance. Those who objected to the use of boats rented at respondents' beach were not annoyed by the presence of many boats which were drawn to that district by the testing of clipper ships at that point or by boats rented at the naval air station to sailors. This complaint is one of which the law does not take notice.

"It is not enough that the business sought to be enjoined is productive of inconvenience, or shocks the taste, or diminishes the value of property in the vicinity, or causes a reduction in rentals. Every person has a right to do with his own property as he sees fit so long as he does not invade the rights of his neighbor unreasonably, judged by the ordinary standards of life, according to the notions and habits of people of ordinary sensibilities and simple tastes." *Crawford v. Central Steam Laundry*, 78 Wash. 355, 139 Pac. 56.

Some of appellant's witnesses testified that their respective properties were of less value by reason of the presence of respondents' bathing beach near their properties. That testimony is controverted by evidence on behalf of respondents to the effect that the presence of the beach did not adversely affect property values in the neighborhood. The trial court

visited the property and stated, in the course of his memorandum decision:

"If that property has depreciated it is due as much, and I believe more, to other surroundings than it is to that bathing beach. There is the Sand Point airplane base and automobiles by the hundreds standing there parked, and new buildings going up there. There is bound to be noise over there at that Sand Point base. There are bound to be noises. A restaurant going up, new industries being built there.

"If that property has depreciated it is not due entirely to the existence of this park or these children playing."

Our examination of the record discloses that the evidence abundantly supports the trial court's finding that the presence of the respondents' beach and camp does not substantially affect property values in that neighborhood. Even if the beach did have the effect upon adjacent property as alleged, it would not be thereby classed as a nuisance. *Crawford v. Central Steam Laundry, supra.*

The action of the board of county commissioners for King county in zoning the rural area in which respondents' property is included as a first-class residential district only, is an unreasonable, unnecessary, arbitrary, and capricious restriction upon the use of private property in the pursuit of usual and lawful business, and does not bear any substantial relation to the public health, safety, morals, or general welfare; hence, the resolution is void. The zoning power of the board of county commissioners is not unbounded. The statute (Rem. Rev. Stat. (Sup.), § 9322-5 [P. C. § 4471-65]) provides that the commissioners may, when it is "deemed reasonably necessary or requisite in the interest of health, safety, morals and the general welfare," regulate and restrict the loca-

tion and the use of buildings and land for residence, trade, industrial, and other purposes.

Most of the large area of land in rural King county included within the strict use restrictions of the zoning resolution, is undeveloped. For the greater part, where there has been development, it consists of farms or small acreage tracts with the exception of a small business and industrial area around the naval air station. Only a few—about five per cent—of the lots within one-half mile from the beach are improved with homes. Respondents' beach is located in the south portion of the area zoned. The percentage of the development decreases as you proceed north within that area.

The area directly surrounding respondents' property consists of commercial, residential, and unimproved property. The portion developed to the north and to the south has been put to the following uses: Three lots to the north are devoted to an apartment house, an eight car garage, and five cottages. It is obvious that this use of the land does not meet the restrictions of a first-class residential district, as provided by the zoning resolution. Of all the property located along the entire lake shore in question these lots only were zoned for second-class residential use. Directly in front of the three lots mentioned there was, until a short time ago, a large commercial floating oil tank, the owners of which paid to the owner of the three lots mentioned a rental of ten dollars monthly for the privilege of maintaining the oil tank at that place. The next eight lots (each fifty feet in width) to the north are occupied by residences of varying estimated values. Less than two hundred feet farther north are situated the buildings, dock, and radio station of the Pan-American Airways depot which were erected in 1940 as a base for commercial planes flying between

Seattle and Alaskan points and were used for that purpose until recently when land planes were substituted for seaplanes on this commercial air route. The property has been used as a testing and mooring base for Boeing Trans-Pacific Clipper ships. North of the Pan-American building for about three hundred feet is a swamp. Nearby are shacks which were originally built and occupied by workmen at the Pan-American base but the character of their present tenants is not disclosed by the record. Next to those shacks is the Matthews farm, with several hundred feet of frontage on the lake.

South of the respondents' beach are a few residences, the closest of which is one hundred and seventy feet distant, and close by is a noisy pump house. Six hundred feet south of respondents' beach is the Sand Point naval air station with naval shops and docks. Eight hundred feet south of the beach and near the air station is a commercial gravel pit, an excavation for a restaurant under construction, three apartment buildings, a parking lot for employees of the air station, and a real estate office.

There is no showing that the zoning of the area in question as a first-class residence district is, as required by the statute (Rem. Rev. Stat. (Sup.), § 9322-5), reasonably necessary or requisite in the interest of health, safety, morals, and the general welfare. The testimony of the three engineers of the King County planning commission that the basis of the zoning classification was the wishes of the people in the vicinity does not satisfy the rule applicable in these cases. The zoning of this large rural area as exclusively a first-class residence district has no relation to public safety or morals and there is *no* evidence that the public health or general welfare will be benefited by the zoning. The question is always what will

best serve the public interests, not what may be the desires of a particular group residing in the vicinity of the area sought to be zoned.

" . . . that the ordinary use of property is not authorized by the general welfare clause of the statute to be prohibited because repugnant to the sentiments or desires of a particular class residing in the immediate neighborhood thereof, but only because such use is detrimental to the interests of the public at large; 'that the restriction authorized by this provision of the statute upon the untrammeled use of property for promotion of the general welfare of the community must be such as will tend in some degree to prevent harm to the public generally or to promote the common good of the whole people of such community.' " *Durkin Lbr. Co. v. Fitzsimmons,* 106 N. J. L. 183, 147 Atl. 555.

See, also, *State ex rel. Modern Lbr. & Millwork Co. v. MacDuff,* 161 Wash. 600, 297 Pac. 733.

It should also be borne in mind that the enforcement of the zoning resolution would result in the destruction of already existing uses of land. The operation of respondents' business antedated the adoption of the zoning resolution passed February 27, 1939. From the date of acquisition of the beach property respondents have worked constantly and invested a large amount of money to improve the premises. We have not receded from the rule that, where the effect of a zoning ordinance or resolution is to destroy or prohibit the continuance of an established and otherwise lawful business, the ordinance or resolution as applied to the property of the objecting owner will not be upheld unless the court can say that it tends to promote the public health, morals, safety, or welfare. While the threatened invasion of a residence district by business may be an impelling reason for affording protection by way of a zoning ordinance or resolution, such an ordinance or resolution may not operate to

remove business found there. *State ex rel. Modern Lbr. & Millwork Co. v. MacDuff*, 161 Wash. 600, 297 Pac. 733.

It is unnecessary to review all of the authorities cited; they are either in harmony with what we have said above or are distinguishable from the case at bar.

The judgment is affirmed.

ROBINSON, C. J., MAIN, STEINERT, and DRIVER, JJ., concur.

¹Reported in 125 P. (2d) 251.